UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| **DONNIE RAY REED** | * | **CIVIL ACTION NO. 11-0226** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Claimant's mother, Julie Reed, filed an application for childhood disability benefits on May 7, 2007, on behalf of her son, D.R.R., born December 14, 1993, based on Attention Deficit Hyperactivity Disorder ("ADHD"), with an onset date of May 7, 2007.

FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Acadia Parish Iota Middle School dated November 12, 2007 to October 15, 2008**.  Claimant's grades ranged from B to F.  (Tr. 138, 144).  He received three days of out of school suspension for talking in class and using profane and/or obscene language by "humping" another student.  (Tr. 141-43).  He was also sent to detention for treating a teacher with disrespect, chewing gum, willful disobedience, leaving class without permission, not bringing his textbook to class, pulling a chair out from under a student, not having his shirt tucked in, being tardy three times, improper us of laptop, horse playing, eating/drinking/littering, and habitual violations of school rules.  (Tr. 147-54).  He was also suspended for three days for vandalizing school property and willful disobedience.  (Tr. 149-50).

**(2) Records from Iota Middle School dated August 13, 2008 to February 26, 2009**.  Claimant had several unexcused tardy dates.  (Tr. 156).  His teacher reported that he was off task most of the time, was easily distracted, missed assignments, participated inappropriately in class, and did not complete his homework.  (Tr. 157-61).  His grades ranged from A to F.  (Tr. 162-65).  He was

suspended from school for refusing to do any work, wanting to put his head down, cover it with a hood and sleep. (Tr. 175-76).

**(3) Records from Dr. Meena Bakare dated November 27, 2006 to May 15, 2007**. Claimant was treated for ADD/ADHD. (Tr. 205-12). He was doing well on medications and doing better in school. (Tr. 207, 211).

**(4) Consultative Examination by Gail Gillespie, Ph.D., dated July 24, 2007**. Claimant had failed and repeated the first and sixth grades. (Tr. 216). He had had three suspensions that school year for repeated tardies, too many referrals, and a fight, and had been truant a total of about two weeks. His grades were Ds and Fs the prior year, and Bs through Ds before that. He admitted to disrespecting his teachers.

Socially, claimant enjoyed hanging out with friends, watching TV, playing video games, riding bikes, or being on the computer. He reported no problems socially. Emotionally, he had a temper, and when angered, he yelled, cursed, or punched a hole in the wall. He said that being on Ritalin helped to calm him down.

On examination, claimant exhibited good attention skills, even though he was not on his ADHD medication that day. He exhibited a full range of appropriate affect, and his mood was pleasant, polite, and cooperative. He was

oriented in all spheres, and his memory for past, present, and recent events was good. His judgment and insight, based on history and observation, were fair to poor.

Claimant's speech and language skills were adequate. (Tr. 217). He reported normal sleep and appetite. He denied any suicidal or homicidal ideation, but did report that he had had thoughts of suicide a year ago and had actually put a belt around his neck.

In summary, Dr. Gillespie stated that claimant's mother noted no significant problems with claimant except for his ability to understand and use what he had learned. He had began to threaten to use, or actually use, objects to hit her. He had recently stolen a game from Wal-mart, but was caught.

Dr. Gillespie's diagnostic impressions were oppositional defiant disorder (emerging into conduct disorder), enuresis, history of ADHD, history of sexual abuse, and learning disorder NOS versus language disorder. (Tr. 218). She opined that these diagnoses could significantly impact his major life activities of communication, attention/concentration, learning, and toileting.

**(5) Childhood Disability Evaluation Form dated August 22, 2007**. Kelly Ray, Ph.D. and Michael Halphen, M.D. found that claimant's impairments of ODD and a history of ADHD were severe, but did not meet, medically equal or

functionally equal the listings. (Tr. 222-23). They determined that claimant had no limitations as to the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 224-25). He was less than marked as to health and physical well-being. (Tr. 225).

**(6) Records from Urology Center of SWLA, Jennings American Legion Hospital, dated November 9, 2005 to January 30, 2009**. On November 9, 2005, claimant was admitted for inability to urinate. (Tr. 196, 287). Dr. J. J. Jancuska's assessment was essentially urinary retention, probably secondary to urethral stricture. (Tr. 249). Dr. Jancuska performed cystocopy, dilation, and voiding cystourethrogram. (Tr. 198, 286).

On November 8, 2006, claimant had no complaints. He self-catheterized himself twice a week, and was urinating okay. (Tr. 241).

On January 24, 2007, claimant was having difficulty urinating. (Tr. 240). He was admitted for urinary retention with urethral stricture and fistula on February 1, 2007. (Tr. 192, 195). Dr. Jancuska performed dilation with cystocopy. (Tr. 192, 195). Claimant was discharged with a Foley catheter and was to begin self-dilation after two weeks.

On February 28, 2007, claimant had no problems. (Tr. 238). The catheter was taken out, and he was going to do self-dilation.

Dr. Jancuska performed cystoscopy on April 10, 2007. (Tr. 246). On June 7, 2007, he repaired claimant's urethral cutaneous fistula. (Tr. 235, 242-45). The diagnosis was abnormal opening in urethral tissue.

Post-operatively, claimant was doing well. (Tr. 234, 236). He had no complaints on July 11, 2007. (Tr. 233). On August 29, 2007, he was urinating fine. (Tr. 232). Dr. Jancuska told him to self-dilate twice a week.

On May 7, 2008, claimant reported that he urinated through one hole, but had a little leakage from the other. (Tr. 270). His enuresis had resolved. Urine was normal.

On June 18, 2008, claimant's fistula was still present. (Tr. 269). Dr. Jancuska repaired the urethrocutaneous fistula. (Tr. 267-68). On August 6, 2008, claimant was healing fine. (Tr. 266). He was not having any significant leakage on September 24, 2008. (Tr. 265).

On January 30, 2009, claimant reported that he had a little urine on rare occasions and bedwetting problems. (Tr. 271). On examination, claimant looked okay. Dr. Jancuska recommended dietary and behavior modifications with reference to the bedwetting.

**(7) Records from Crowley Mental Health Center dated December 17, 2007 to October 17, 2008**.  Claimant was seen for an anger problem.  (Tr. 254).  On mental status examination, his thought form was logical and goal directed, his affect was full range and spontaneous, his mood was euthymic and stable, he had poor sleep disturbance, and he had no suicidal or homicidal ideation.  (Tr. 259).  He was alert and oriented x 4.  (Tr. 260).  His memory was intact, concentration was normal, intellect was average, and insight and judgment were poor.

Claimant's diagnoses were parent-child relational problems, sibling relational problems, r/o oppositional defiant disorder, r/o learning disorder, NOS, and attention deficit hyperactivity disorder.  His Global Assessment of Functioning Score was 41, and 60 for the previous year.  (Tr. 261).  He was admitted to the clinic for individual therapy and medication management.  He was prescribed Ritalin.  (Tr. 262-63).

**(8) Records from Crowley Mental Health Center dated February 4-6, 2009**.  Claimant was treated for attention deficit hyperactivity disorder, oppositional defiant disorder, and learning disorder, NOS.  (Tr. 299).  He was mostly compliant with the medications, and denied having any side effects.  He was mostly calm and attentive.  He had picked up his grades.  He had had some

conflicts with his mother, but his behavior was mostly stable. He was to continue his medications and treatment with his primary therapist.

**(9) Records from Dr. James Jancuska dated March 25, 2009 to April 7, 2009**. On March 25, 2009, claimant, age 15, complained of difficulty urinating. (Tr. 303). He had cystoscopy and dilation. (Tr. 302). Afterwards, he had no complaints.

**(10) Records from Crowley Mental Health Center dated May 1, 2009 to October 12, 2009**. On June 1, 2009, claimant was compliant with his medications and denied any side effects. (Tr. 310). He was sleeping from 10 or 11 p.m. to 6 a.m. He was mostly calm and attentive. He had had some conflicts with his mother, but his behavior was mostly stable. He tended to avoid doing work.

Claimant had passed the LEAP test, and was going into the 9th grade. He stated that he had been feeling down and depressed lately. He was prescribed Lexapro and continued on Adderall. On June 22, 2009, claimant's mood had improved with the Lexapro.

On October 12, 2009, claimant stated that he was compliant with the medications and denied any side effects. (Tr. 306). He did not have any problems with sleep or appetite. His grades were Cs. He said that he felt calm and attentive. He was working on his relationship with his mother. He described his mood as

being euthymic. He was continued on his medications and treatment with his primary therapist. He was doing well overall.

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on March 16, 2009, claimant was 15 years old. (Tr. 27). He testified that he was in eighth grade in regular classes. (Tr. 28). He stated that he was able to keep up with the other kids in P.E. (Tr. 29).

Claimant reported that he did not pass all of his classes during his last grading period. He testified that he had been suspended three times for throwing another student on the floor and humping him, and for sleeping in class. (Tr. 29). He also stated that he had been expelled for threatening to cut his teacher. (Tr. 30).

Claimant testified that he did his homework sometimes for an hour to an hour and 30 minutes at the most. (Tr. 31). He said that he helped with chores, including taking out the trash, cleaning the bathroom, sweeping, cutting the grass, and washing the car. (Tr. 31-32).

Claimant testified that he got along with his sister all right, but fought with her sometimes. (Tr. 32). He said that he had friends his own age with whom he hung out and played video games. He reported that he was not always polite to his mother, and sometimes pushed her away, broke things and cursed. (Tr. 32-33).

Claimant testified that his mother had called the police once when he left the house against her orders. (Tr. 33). He also stated that he had been arrested for being out past curfew on school grounds while he and some friends were burning a frog.

As to activities, claimant reported that during the summer, he camped and fished with his friends. (Tr. 34). He also read, watched television, and listened to rock and rap music. (Tr. 35).

Claimant testified that he had had surgery on his bladder and had to use a catheter. He said that he no longer used a catheter, but still needed to have surgeries. (Tr. 36). He stated that he was taking Adderall, which helped him stay more focused. (Tr. 35-36).

**(12) Administrative Hearing Testimony of Claimant's Mother, Julie Reed**. Claimant's mother testified that claimant's urology problem was ongoing. (Tr. 39). However, she stated that he did not have bed wetting problems anymore. (Tr. 43). She reported that his ADHD was better when he took his medication, but he did not take it sometimes. (Tr. 39, 44). She complained that he had anger problems and did not comprehend. (Tr. 39).

Ms. Reed stated that claimant was failing in school. However, he had been promoted to the next grade for the past two years. He was also enrolled in Teen

Court.  (Tr. 40).

Additionally, claimant's mother testified that claimant did only about 15 or 20 percent of his chores, and that it took him several days to do them.  (Tr. 41).  She said that he had been threatening to her and she had had to call the police.  She also reported that he had threatened his sister with sticks, pipes, tire tools, and knives.  (Tr. 46).

Ms. Reed testified that claimant was taking Adderall.  (Tr. 51).  She said that he did not currently use a catheter, but still needed surgeries for scar tissue.  (Tr. 52).  She reported that he had last used the catheter last summer.

**(13 ) The ALJ's Findings are Entitled to Deference**.  Claimant argues that: (1) the ALJ erred in failed to call a vocational/functional expert and in relying on opinion evidence from a 2007 state childhood disability evaluation form; (2) the ALJ erred in failing to consider the evidence regarding his marked and severe limitations, particularly the report by Dr. Gillespie, and (3) the ALJ erroneously considered this matter to be an appeal of the conclusions of the initial review or a form filled out in the state determination process.

As to the first argument, claimant asserts the ALJ erred in relying on the grids instead of calling a vocational/functional expert.  However, the regulations provide for a three-step process for determining disability in children, not the five-

step process as in the case for adults. 20 C.F.R. § 416.924 (children); 20 C.F.R. § 416.924 (adults). Here, claimant was an adolescent at the time of his SSI application through the date of the ALJ's decision. Thus, the ALJ correctly applied the three-step process and did not need to call a vocational expert. (Tr. 14).

Claimant also argues that the ALJ improperly relied on the 2007 Childhood Disability Evaluation Form, which did not consider any of the medical evidence later produced. However, ALJs are required to consider the findings of state agency medical consultants in formulating their opinions. 20 C.F.R. §404.1527(e)(2)(i) ("administrative law judges *must* consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion") (emphasis added). In any event, the record reflects that not only did the ALJ rely on the findings by Dr. Ray and Dr. Halphen in the Childhood Disability Evaluation Form, but he also cited the opinions of Dr. Gillespie, Dr. Jancuska, and the physicians at Crowley Mental Health Center, as well as claimant's school records. (Tr. 17-22). Thus, this argument lacks merit.

Next, claimant argues that the ALJ failed to consider, accept, and apply the large amount of evidence supporting his "marked and severe" limitations,

particularly in Dr. Gillespie's report.

Dr. Gillespie opined that claimant's diagnoses could *significantly* impact his major life activities of communication, attention/concentration, learning, and toileting. (emphasis added). (Tr. 218). However, this does not equate to a "marked" or "severe" impairment as argued by plaintiff. As the ALJ properly found, claimant did not have an impairment or combination of impairments that resulted in either "marked" or "extreme" limitation in one domain of functioning based on the evidence of record.

To "functionally equal" the listings, a child's impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

Claimant argues that the ALJ erred in finding that he did not have marked limitations regarding communication, attention/concentration, learning, and toileting as found by Dr. Gillespie. Under the regulations, a "marked" limitation is defined as an impairment which "interferes seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2). A child's

13

day-to-day functioning may be seriously limited when his impairment limits only one activity or when the interactive and cumulative effects of his impairment limit several activities. *Id*. A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning that the Social Security Administration ("SSA") would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*.

An "extreme" limitation is defined as an impairment which "interferes very seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(3). A child's day-to-day functioning may be very seriously limited when his impairment limits only one activity or when the interactive and cumulative effects of his impairment limit several activities. An "extreme" limitation also means a limitation that is "more than marked." *Id*. An "extreme" limitation is the rating that is given to the worst limitations. *Id*. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. *Id*. It is the equivalent of the functioning that the SSA would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id*.

As to acquiring and using information, claimant argues that he has a marked limitation, because he had "tremendous problems" in home and in school, namely failing and being repeatedly suspended and expelled. The ALJ determined that claimant had a less than marked limitation in this domain. (Tr. 30). Although it was reported to Dr. Gillespie that he had failed two grades and was in resource classes, claimant reported that he was in regular classes. (Tr. 215-16). While his 2008-2009 report card showed mostly Fs and one C, his eighth grade report card showed As and Bs in addition to Fs. (Tr. 138-39, 162-65). The records from Crowley Mental Health Center confirmed that his grades had improved, and that his behavior was mostly stable. (Tr. 299). This finding is further supported by Dr. Ray and Dr. Halphen's evaluation, in which they found that claimant had a less than marked limitation as to acquiring and using information. (Tr. 224). As the ALJ's finding regarding this domain is supported by the evidence, it is entitled to deference.

Regarding the attending and completing tasks domain, claimant argues that his major life activities significantly impacted his attention/concentration according to Dr. Gillespie's report. As the ALJ noted, Dr. Bakare observed that claimant was doing better in school and that the teachers were glad. (Tr. 19, 207). Additionally, Dr. Gillespie stated that claimant exhibited good attention skills,

15

although he was not on his ADHD medications on the day of the evaluation. (Tr. 216). Further, Dr. Ray and Dr. Halphen found that claimant had a less than marked limitation as to attending and completing tasks. (Tr. 224). Thus, the ALJ's finding as to this domain is supported by the record.

As to interacting and relating to others, claimant argues that he had "tremendous problems" at home and in school in conducting himself so as to have been repeatedly suspended and expelled. While claimant had sought treatment at Crowley Mental Health Center for an anger problem, the records reflect that his behavior was mostly stable after medications. (Tr. 310). He reported that his mood had improved with Lexapro. Additionally, he reported to his therapist that his anger had been controlled. (Tr. 300). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Thus, this argument lacks merit.

As to health and physical well-being, claimant argues that he has problems with toileting. However, Dr. Jancuska's records reflect that in August, 2007, claimant had no persistence of the fistula and he was urinating fine. (Tr. 232).

His enuresis had resolved in May, 2008. (Tr. 270). He had no complaints at his last visit in April, 2009. (Tr. 302).

Claimant's mother testified that he had stopped bed wetting. (Tr. 43). Drs. Ray and Halphen found that he had less than marked limitation as to this domain. (Tr. 225). Thus, the ALJ's findings are supported by the evidence.

Finally, claimant argues that the ALJ treated his decision as an appeal of the state agency's initial determinations. Specifically, the asserts that the ALJ erroneously relied on the opinions of the state agency examiners. However, the Social Security Regulations state that ALJs cannot ignore the opinions of state agency medical and psychological consultants. SSR 96-6p. In fact, this regulation further provides that "[a]lthough the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council *must consider and evaluate* any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists." (emphasis added). This requirement is mandatory. Thus, claimant's argument lacks merit.

Claimant mentions, without assigning as error, that the ALJ had the duty to determine credibility and articulate the reasons why he accepted or rejected a

particular source of evidence.  However, the record reflects that the ALJ did make a credibility determination as follows: "[t]he Administrative Law Judge has considered the testimony offered at the hearing in this matter.  Both his mother and the claimant seemed fairly candid in their subjective reports, but they have not described a condition, which is considered disabling." (Tr. 23).  It is well established that the ALJ's finding as to credibility is entitled to great deference. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).   Thus, this argument lacks merit.

Accordingly, based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED. R. CIV. P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed May 16, 2012, Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE